**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHELE ANN HURLEY,<br><br>              Plaintiff,<br><br>       v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social<br>Security,<br><br>          Defendant. | ) Case No. CV 16-5892-JPR<br>)<br>)<br>) **MEMORANDUM DECISION AND ORDER**<br>) **REVERSING COMMISSIONER**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed May 24, 2017, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is reversed and this action is remanded for further proceedings.

1

## II.  BACKGROUND

Plaintiff was born in 1961.  (Administrative Record ("AR")
82.)  She completed 12th grade and worked as a general manager
and director of operations at a health club.  (AR 163-64.)

On August 15, 2013, Plaintiff applied for DIB, alleging that
she had been unable to work since August 29, 2006, because of
"carpal tunnel bilateral wrists and hands," migraines,
depression, anxiety, "tingling and numbness" in her arms and
legs, incontinence, and pain in her back, neck, leg, "upper
extremity . . . in shoulders and arms," "lower extremity," and
knee.[1]  (AR 82-83.)  Plaintiff later amended her onset date to
February 25, 2009.  (AR 35, 147.)  After her application was
denied initially, she requested a hearing before an
Administrative Law Judge.  (AR 82-89, 100-01.)  A hearing was
held on January 26, 2015, at which Plaintiff, who was represented
by counsel, testified, as did a vocational expert and a medical
expert.  (See AR 32-74.)  In a written decision issued February
2, 2015, the ALJ found that Plaintiff was not disabled at any
time between February 25, 2009, her amended alleged onset date,
and December 31, 2011, her date last insured, and could have
performed her past relevant work during that period.[2]  (AR 15-

---

[1] Plaintiff did not specify in her application whether her
"lower extremity," leg, and knee pain was on the right or left
side, or both.  (AR 82-83.)  At the hearing, however, she noted
that the pain was "mainly" on the left side of her body.  (AR 49,
56.)

[2] On the last page of her decision, the ALJ incorrectly used
the original onset date, August 29, 2009, rather than the amended
onset date.  (See AR 27.)  Because the ALJ used the amended onset
(continued...)

2

31.) Plaintiff requested review from the Appeals Council, and on June 10, 2016, it denied review. (AR 1-5.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not

_____

[2] (...continued)
date throughout her opinion (see AR 18, 20), that was likely simply a scrivener's error.

3

substitute its judgment" for the Commissioner's. <u>Id.</u> at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is

4

conclusively presumed. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform her past work; if so, she is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 404.1520(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.    The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between February 25, 2009, the amended alleged onset date, and December 31, 2011, her date last insured. (AR 20.) At step two, she concluded that during the relevant period, Plaintiff had the severe impairments of "degenerative disc disease of the cervical and lumbar spine, and obesity." (Id.) At step three, she determined that Plaintiff's

_____

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

5

impairments did not meet or equal a listing.  (AR 24.)

At step four, the ALJ found that through her date last insured, Plaintiff had the RFC to perform a full range of light work.[4]  (Id.)  Based on the VE's testimony, the ALJ concluded that Plaintiff could have performed her past work as an "operations manager/health club manager" during the relevant period, both as she actually performed it and as it is generally performed.  (AR 26-27.)  Accordingly, she found that Plaintiff was not disabled during that time.  (AR 27.)

**V.  DISCUSSION**

Plaintiff alleges that the ALJ erred in assessing the medical evidence,[5] assessing her credibility, and determining her RFC.  (See J. Stip. at 6-10, 21-27, 27-32, 38-40, 48-51, 51.) Because the ALJ erred in the first respect, the matter must be remanded for further analysis and findings.

    A.  <u>The ALJ Erred in Considering Dr. Padveen's Opinion</u>

        1.  <u>Applicable law</u>

"Acceptable medical sources" under the Social Security regulations include only licensed physicians, psychologists, optometrists, podiatrists, and speech pathologists.

---

[4] "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  § 404.1567(b).  A job is considered "light" "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.

[5] Plaintiff's issue one, whether the ALJ gave appropriate weight to the opinion evidence, and her issue three, whether the ALJ properly evaluated her severe impairments, are addressed together.

6

§ 404.1513(a).[6]  Chiropractors are treated as "other sources,"
see § 404.1513(d)(1), and an ALJ may reject opinions from "other
sources" by giving "reasons germane to each witness for doing
so." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012)
(citation omitted); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217,
1224 (9th Cir. 2010) (citation omitted).  If an ALJ errs by
rejecting an opinion from an "other" source without providing a
germane reason, that error is harmless if the Court can "conclude
from the record that the ALJ would have reached the same result
absent the error." Molina, 674 F.3d at 1115; Marsh v. Colvin,
792 F.3d 1170, 1172 (9th Cir. 2015).

## 2.  Relevant background

Plaintiff apparently suffered cumulative work-related trauma
between February 2001 and August 2004, when she worked as a
general manager and director of operations at a health club.  (AR
484.)  Dr. Brian K. Padveen, a chiropractor, evaluated and
treated Plaintiff as part of her worker's-compensation claim.

---

[6] Social Security regulations regarding the evaluation of
opinion evidence were amended effective March 27, 2017.  When, as
here, the ALJ's decision is the Commissioner's final decision,
the reviewing court generally applies the law in effect at the
time of the ALJ's decision.  See Lowry v. Astrue, 474 F. App'x
801, 804 n.2 (2d Cir. 2012) (applying version of regulation in
effect at time of ALJ's decision despite subsequent amendment);
Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir.
2004) ("We apply the rules that were in effect at the time the
Commissioner's decision became final."); Spencer v. Colvin, No.
3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1,
2016) ("42 U.S.C. § 405 does not contain any express
authorization from Congress allowing the Commissioner to engage
in retroactive rulemaking").  Accordingly, citations to 20 C.F.R.
§ 404.1513 are to the version in effect from September 3, 2013,
to March 26, 2017.

(Id.)  On November 18, 2009, Dr. Padveen completed an initial report.  (AR 484-507.)  Plaintiff complained of neck, shoulder, hand, wrist, and back pain.  (AR 486-87.)  Dr. Padveen tested Plaintiff's range of motion and muscle and grip strength (AR 490-502) and ordered and reviewed four x-rays of her cervical spine (AR 502).  Based on his physical examination and review of her x-rays, Dr. Padveen made a "diagnostic impression" of "[c]ervical spine, herniated nucleus pulposus at C3-C4, C4-C5, C5-C6 and C6-7 with neuroforaminal narrowing/spondylosis at C4-C5 and C5-C6 and C6-C7"; "[l]umbar spine degenerative disc disease at L4-5 with herniated nucleus pulposus and neuroforaminal narrowing at L4-5"; "[f]acet hypertrophy at L4-5 and L5-S1"; "[r]ight shoulder sprain/strain"; "[c]ervicogenic headaches"; "[t]horacic spine sprain/strain"; "[b]ilateral wrists - myoligamentous sprain/strain; rule out bilateral carpal tunnel syndrome"; "[f]ifty-pound weight gain secondary to injury"; and "[a]nxiety/stress."  (Id.)  He ordered "bilateral cock-up splints" for her wrists, noting that her symptoms were "consistent with carpal tunnel syndrome."  (AR 503, 531-32.)  He examined Plaintiff again on January 6, 2010, noting generally the same diagnoses as those in his November 2009 report.  (AR 526.)

On April 7, 2010, after reviewing a report by a consulting orthopaedic doctor, Dr. Padveen noted that "[h]erniated nucleus pulposus C3-7 with neural foraminal narrowing, herniated nucleus pulposus L4-5 with neural foraminal narrowing, facet hypertrophy L4-S1 and right wrist carpal tunnel syndrome" were diagnosed by the orthopaedist, who had recommended that Plaintiff undergo right-wrist surgery.  (AR 527.)  On April 12, 2010, Dr. Padveen

8

examined Plaintiff and confirmed his earlier diagnoses, including that her carpal tunnel syndrome was "clinical." (AR 535.) He added "C6 [r]adiculopathy," recommended that "gastro esophageal reflux disease and gastritis be amended to [her] claim," and recommended referral to a psychologist for "consultation and treatment of her anxiety and stress." (Id.) Dr. Padveen noted that Plaintiff had declined the right-wrist surgery recommended by the orthopaedist. (Id.) On May 17, 2010, after examining Plaintiff and reviewing a consulting psychologist's recent opinion, Dr. Padveen confirmed his April 2010 diagnoses. (AR 542.)

On June 11, 2010, in a supplemental report for her worker's-compensation case, Dr. Padveen noted that a consulting pain-management doctor had examined Plaintiff and diagnosed "[r]ule out bilateral carpal tunnel syndrome, [r]ule out de Quervain's syndrome, [c]ervical spine spondylosis with radiculopathy, [and] [i]nsomnia." (AR 545.) Dr. Padveen found those diagnoses "reasonable" and incorporated them into his report. (Id.)

Dr. Padveen completed a "primary treating physician's permanent and stationary report" for Plaintiff's worker's-compensation case on July 12, 2010. (AR 549-75.) In it, he noted that his "final" "diagnostic impression" was "[r]ight carpal tunnel syndrome," "[c]ervical trapezial regional myofascial pain syndrome vs. fibromyalgia," "[a] 50 pound weight gain," and "[s]uspect[ed] sleep apnea secondary to psychological factors and 50 pound weight gain"; he added that the consulting psychologist had diagnosed "depressive disorder" and "[a]nxiety disorder." (AR 555.) His examination of Plaintiff confirmed

9

loss of range of motion and "[p]ositive orthopedic testing" in
her cervical, thoracic, and lumbar spines.  (AR 556-57.)  He
noted "[p]ositive orthopedic testing" and "[h]ypoesthesia over
the median innervation" in her right wrist and hand.  (AR 557.)
He assessed various "work restrictions" related to her spine and
wrist conditions.  (Id.)  He confirmed his "final" diagnoses in
August 2010, following a physical examination.  (AR 577.)

On January 12, 2011, Dr. Padveen completed a supplemental
report for Plaintiff's worker's-compensation case.  (See AR 578-
94.)  In it, he summarized recent medical records from
Plaintiff's consulting orthopaedic doctor and psychologist.  (AR
578-82.)  He incorporated the findings of Plaintiff's
psychologist into his opinion, noting that she should be "seen by
a sleep specialist" to determine if she "has developed sleep
apnea."  (AR 582-83.)  He noted that Plaintiff's orthopaedic
doctor had "essentially noted symptoms compatible with [Dr.
Padveen's] own examination and treatment course."  (AR 583.)

Dr. John W. Axline, a specialist in orthopaedic surgery,
testified by videoconference as a medical expert at Plaintiff's
January 26, 2015 hearing.  (AR 32-34, 36-45, 135.)  Based on a
review of her medical records, Dr. Axline opined that Plaintiff
had degenerative disc disease of the lumbar and cervical spines
(AR 37) and recommended that "lifting and carrying limits be
imposed" because of those conditions (AR 39).  He opined that
Plaintiff had not been diagnosed with, nor did the medical record
support, any other conditions or work restrictions.  (AR 38-40.)
When asked by Plaintiff's counsel to discuss Dr. Padveen's
opinions, Dr. Axline stated:

Those are chiropractic notes, ma'am.  They are not

useful for my purposes today.

(AR 40-41.)  Dr. Axline opined that the record did not support a

diagnosis of carpal tunnel syndrome, noting that "she may have

it, but it's not established in the files."  (AR 41.)

Plaintiff's counsel asked Dr. Axline a second time to comment on

Dr. Padveen's opinions; he responded only that "[a]s we know,

it's a chiropractic."  (AR 42.)

        3.    <u>Analysis</u>

        The ALJ found that during the relevant period Plaintiff had

severe impairments of "degenerative disc disease of the cervical

and lumbar spine, and obesity," and was capable of performing a

full range of light work.  (AR 20, 24.)  She summarized the

opinions of Plaintiff's treating doctors and chiropractor Dr.

Padveen, the consulting examiners, and medical expert Dr. Axline.

(AR 20-26.)  She gave "no weight" to chiropractor Padveen's

findings because "he is not a qualified medical source."  (AR

20.)  She gave the "greatest weight" to Dr. Axline's opinion,

noting that he "reviewed the medical records prior to the hearing

and personally observed [Plaintiff] at the hearing."  (AR 26.)

        To reject Dr. Padveen's opinion, the ALJ had to give only a

germane reason; she failed to do so.  In assessing the opinion,

the ALJ stated that she gave "no weight" to his "diagnostic

impressions" because he "is not a qualified medical source."  (AR

20.)  She noted Dr. Axline's view that "Dr. Padveen's

chiropractic notes were not useful for assessing" Plaintiff's

RFC.  (AR 20-21.)  At the hearing, when asked by Plaintiff's

counsel to comment on Dr. Padveen's opinions, Dr. Axline

11

disregarded them as "chiropractic notes" and stated that "[t]hey are not useful for my purposes today." (AR 40-41.) When asked again about Dr. Padveen's opinions, Dr. Axline simply dismissed them as "chiropractic." (AR 42.)

The ALJ's only stated reason for rejecting Dr. Padveen's opinion was that he was not a "qualified medical source." (AR 20.) That is not sufficient. See Haagenson v. Colvin, 656 F. App'x 800, 802 (9th Cir. 2016) (finding that ALJ failed to provide germane reason for rejecting opinion of claimant's nurse and counselor because "[t]he only reason that the ALJ offered for rejecting their opinions is that they are not 'acceptable medical sources' within the meaning of the federal regulation").

And although inconsistency with other objective evidence is a germane reason to reject other-source evidence, see Molina, 674 F.3d at 1111-12, and Dr. Axline's opinion is generally at odds with Dr. Padveen's assessment, the ALJ did not cite that inconsistency as a reason for rejecting Dr. Padveen's opinion. Further, Dr. Axline also dismissed Dr. Padveen's opinion solely because he was a chiropractor. Indeed, neither Dr. Axline nor the ALJ cited any specific inconsistencies between the two doctors' opinions or between Dr. Padveen's opinion and any other medical-opinion evidence. See Nguyen v. Berryhill, No. 3:16-cv-01665-LB, 2017 WL 1196800, at *14-15 (N.D. Cal. Mar. 31, 2017) (finding ALJ's reason for rejecting other- source opinion "insufficient" because ALJ failed to "cite specific inconsistencies" with objective evidence); see also Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (reasons for rejecting other-source testimony must be "germane" and

"specific").

Defendant suggests that any error in failing to incorporate Dr. Padveen's opinion into Plaintiff's RFC was harmless because the ALJ "did find degenerative disc disease to be a severe impairment, and Plaintiff's back condition was considered, along with Plaintiff's other severe and not severe impairments." (J. Stip. at 46-47.) But Dr. Padveen diagnosed Plaintiff with carpal tunnel syndrome and radiculopathy, suspected that she had sleep apnea, and confirmed a diagnosis of anxiety disorder. (AR 545, 555.) The ALJ did not incorporate limitations stemming from any of those conditions into Plaintiff's RFC, and she specifically found that no "definitive diagnos[is]" of carpal tunnel existed in the record (see AR 21), apparently ignoring Dr. Padveen's such diagnosis (see AR 555). Further, Dr. Padveen's assessment was consistent with at least three other sources of medical-opinion evidence. (See AR 527 (noting consistency with opinion of consulting orthopaedist), 555, 582 (noting agreement with consulting psychologist), 583 (noting consistency with pain-management doctor).) Thus, the Court cannot "conclude from the record that the ALJ would have reached the same result absent the error." Molina, 674 F.3d at 1115.

Because the ALJ failed to provide a germane reason for giving no weight to Dr. Padveen's opinion, remand is warranted.

B.  The ALJ Did Not Err in Considering the Other Medical
Opinions

Plaintiff asserts that the ALJ failed to properly evaluate other medical-opinion evidence. (J. Stip. at 6-10, 21-27, 41-43, 48.) Specifically, she contests the ALJ's assessment of Dr.

13

Henry Tang's and Dr. Bal Grewal's opinions.[7] (Id.) For the reasons discussed below, the ALJ did not err.

### 1. Applicable law

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither. Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. Id.

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. § 404.1527(c)(2)-(6).

---

[7] Plaintiff also argues that the ALJ erred in giving substantial weight to the opinion of medical-expert Dr. Axline. (J. Stip. at 9.) Because the ALJ must reconsider Dr. Padveen's opinion on remand, she will also have to reassess Dr. Axline's opinion, which relied on the same faulty reasoning to dismiss Dr. Padveen's opinion.

14

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. (citing Lester, 81 F.3d at 830-31). Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

"[T]he findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam). Further, greater weight may be given to a nonexamining doctor who testifies at a hearing and is subject to cross-examination. Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995).

2. Relevant background

Dr. Tang, a neurologist, first examined Plaintiff on March 18, 2013.[8] (AR 437, 448, 623.) Plaintiff complained of "[l]eft [u]pper [e]xtremity [p]ain and [t]ingling [s]ensation," "intermittent left hand tingling sensation," "persistent neck

---

[8] As indicated by the "D.O." following his name, Dr. Tang is also an osteopathic doctor. (AR 437.) Osteopathic doctors are considered acceptable medical sources under the regulations. See § 404.1513(a)(1).

pain," and "mild weakness" in her left shoulder, bicep, and tricep. (AR 437.) She traced the pain to an incident in March 2012, when she apparently "hyperextended her left shoulder and arm" while reaching for her phone. (Id.) Dr. Tang noted an "essentially normal" left-elbow MRI from December 31, 2012 (see AR 447), and "[n]o evidence for bicep tear" (AR 437). On examination, Dr. Tang noted normal lower-extremity strength. (AR 438.) He ordered an EMG, which was "abnormal." (AR 437-38.) It revealed "[c]hronic mild to moderate left C7 [c]ervical [r]adiculopathy" and "[m]ild left [u]lnar [n]europathy at the [e]lbow." (AR 439, 440-44.) He recommended an MRI of Plaintiff's cervical spine and advised her to wear a sleeve on her left elbow. (AR 439.)

In an office visit on April 18, 2013, Plaintiff complained of "left hand tingling and numbness" and "persistent neck pain and mild weakness" in her "left upper extremity." (AR 445.) On physical examination, Dr. Tang observed "5/5 [strength] in right upper and bilateral lower extremities." (Id.) He reviewed an MRI of her cervical spine, which revealed "[m]ultilevel degenerative disc changes." (AR 446.) He assessed "[c]hronic mild-to-moderate left C7 [c]ervical [r]adiculopathy" and "[m]ultiple cervical disc protrusions effacing the ventral surface of the spinal cord most notably at C3-4 and C5-6." (AR 446-48.) He recommended referral to another doctor, presumably a specialist. (AR 446.)

Dr. Tang completed a "cervical spine residual functional capacity questionnaire" on April 18, 2013. (AR 623-27.) In it, he noted diagnoses of "cervical spine stenosis" and "cervical

16

radiculopathy." (AR 623.) He described Plaintiff as suffering

from "neck pain, [left] upper extremity weakness, numbness."

(Id.) Her symptoms included tenderness, muscle spasm and

weakness, sensory and reflex changes, reduced grip strength, and

"drop[ping] things." (Id.) Dr. Tang checked a box to indicate

that she had "significant limitation of motion" but did not

specify where or by how much. (Id.) He checked boxes to

indicate that Plaintiff had "daily" "severe headache pain

associated with impairment of the cervical spine," which caused

an inability to concentrate, impaired sleep, and exhaustion and

could be made "better" by taking medication and going to a "quiet

place" or "dark room." (AR 624.) Dr. Tang noted that he was

"not primarily seeing [Plaintiff] for headaches." (Id.) He

checked boxes to indicate that Plaintiff's "impairments lasted or

can . . . be expected to last at least twelve months" and that

she was not a "malingerer." (Id.) He found that her impairments

were "reasonably consistent" with her symptoms and the functional

limitations he had assessed. (AR 625.) He checked boxes to

indicate that "during a typical workday," Plaintiff's pain would

"frequently" interfere with the "attention and concentration

needed to perform even simple work tasks" and that she would be

able to tolerate only "low stress jobs." (Id.) Dr. Tang opined

that Plaintiff would be able to walk only one city block "without

rest or severe pain," could sit for only 10 minutes before

needing to stand, could stand for only 15 minutes before needing

to sit or walk around, and could "sit and stand/walk" for "less

than 2 hours" in an eight-hour workday. (AR 625-26.) He opined

that she would "need a job that permits shifting positions at

17

will from sitting, standing, or walking" and would need to walk
for five minutes every 15 during the workday. (AR 626.) In half
a workday, Plaintiff would need to take three or four
"unscheduled breaks," resting her head on a "high-back chair" for
15 to 20 minutes each time. (AR 626.) She could "occasionally"
lift 10 pounds, "rarely" lift 20, and "never" lift 50 pounds.
(Id.) She could "occasionally" look down, turn her head right or
left, look up, hold her head in a static position, twist, or
stoop. (AR 626-27.) She could "rarely" crouch or squat or climb
ladders or stairs. (AR 627.) Dr. Tang opined that Plaintiff's
impairments were "likely to produce 'good days' and 'bad days'"
and cause her to be absent from work "[m]ore than four days per
month." (Id.)

On April 29, 2010, Dr. Grewal, a qualified medical examiner
and psychologist, examined Plaintiff as part of a
"[p]sychological [p]ain [c]onsultation" for her worker's-
compensation case. (See AR 382-419.) In a mental-status
examination, Plaintiff appeared to be in "moderate" psychological
distress, presented an "anxious, and depressed & tearful" mood,
had "slightly impaired" attention and concentration skills and
"mild deficits" in immediate memory, and was of "average"
intelligence. (AR 386.) Her "fund of information" was
"consistent with her background and intellectual level," and she
had "normal" abstracting ability and "below normal" computational
skills. (AR 386-87.) Her thought processes were "logical and
coherent." (AR 387.) Dr. Grewal opined that Plaintiff was not
elaborating or exaggerating her symptoms. (AR 388-89.) Her
prognosis was "good," and Dr. Grewal "anticipated that [her]

18

period of recovery will continue over a period of 3-6 months."
(AR 389.) A series of psychological tests revealed that
Plaintiff "exhibited difficulty with concentration and attention"
(AR 387), "experience[d] distress, depression and anxiety
symptoms in response to coping with [her] chronic pain" (AR 389),
had "a moderate level" of depression (AR 390) and anxiety (AR
392), "does not adapt well to the pain" (id.), had no
"neurological or psychomotor impairment" (id.), and manifested
"depression, hopelessness, anxiety and social withdrawal" (id.).
He diagnosed Plaintiff with depressive and anxiety disorders.
(AR 393-94.) He assessed "slight" and "moderate" levels of work-
function impairment. (AR 395-96.) He noted that she had "some
impairment in several areas, such as work or school, family
relations, judgment, thinking, or mood." (AR 396.) He opined
that Plaintiff had at most a "mild" impairment in "activities of
daily living," "social functioning," "concentration, persistence,
and pace," and "adaptation, decompensation in work or work-like
settings." (AR 398.) He recommended medication management,
neuromuscular reeducation, individual psychotherapy, and
chiropractic or physical therapy. (AR 401-02.)

Dr. Grewal completed a "Psychological Permanent and
Stationary Evaluation" on October 12, 2010, for Plaintiff's
worker's-compensation case. (See AR 411-31.) In a series of
psychological tests, Plaintiff "exhibited difficulty with
concentration and attention" (AR 417), "experience[d] distress,
depression and anxiety symptoms in response to coping with her
chronic pain" (AR 418), "struggle[d] with pain on a daily basis"
(AR 419), reported experiencing pain that was "very disruptive to

her life" (id.), and had an "impaired ability to focus and concentrate" (id.). Dr. Grewal again diagnosed depressive and anxiety disorders. (AR 421.) He noted "slight" to "moderate" work-function impairments (AR 422-23) and at most "moderate" impairment in Plaintiff's "activities of daily living," "social functioning," "concentration, persistence, and pace," and "adaptation, decompensation in work or work-like settings" (AR 424-25). He noted that Plaintiff does not "perform most of the activities that would be required for day-to-day functioning." (AR 428.) He assessed a global assessment functioning score of 60.[9] (Id.) For her "[f]uture [m]edical [c]are," Dr. Grewal opined that Plaintiff would need "additional orthopedic consultation and chiropractic/physical therapy for flare-ups" and a "brief period of biofeedback training and supportive psychotherapeutic treatment in order to help her maintain her level of functioning and reenter gainful employment or vocational rehabilitation." (AR 430.) He opined that "[f]rom a psychological perspective," Plaintiff suffered from difficulties that "would interfere with her ability to perform essential functions of her usual and customary occupation." (AR 431.)

---

[9] GAF scores assess a person's overall psychological functioning on a scale of 1 to 100. See Diagnostic and Statistical Manual of Mental Disorders 30 (revised 4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms or difficulty in social, occupational, or school functioning. See id. at 32. GAF scores have been excluded from the latest edition of DSM because of concerns about their reliability and lack of clarity, however. See DSM-V 15-16 (5th ed. 2013).

### 3. Analysis

#### a. *Dr. Tang*

As an initial matter, it is not clear that Dr. Tang was among Plaintiff's treating physicians or that his April 2013 assessment of her limitations was based on medical records from the relevant period. Dr. Tang apparently first saw Plaintiff on March 18, 2013 — more than a year after her date last insured — when he examined her, conducted an EMG, and ordered an MRI (AR 623, 437-44); he saw her again on April 18 to review the MRI (AR 445-46, 448) and to complete a cervical-spine RFC questionnaire (AR 623-27). Indeed, Dr. Tang's April 2013 RFC assessment appears to be based on only two visits, an EMG, and a single MRI, all of which occurred in 2013. (See id.) Even if the Court assumes Dr. Tang was a treating doctor, the length and nature of the treatment relationship is relevant in assessing whether the ALJ gave specific and legitimate reasons for rejecting his opinion. See § 404.1527(c).

The ALJ gave "[n]o weight" to Dr. Tang's RFC assessment in part because it was not supported by his treatment notes.[10] (AR 26.) The opinion was rendered on a preprinted check-box form that listed potential symptoms and other information and provided blank spaces for comments. (See AR 623-27.) Dr. Tang opined that Plaintiff had headaches that made her unable to concentrate, impaired her sleep, and exhausted her (AR 624); experienced pain

---

[10] The ALJ refers to a "Dr. Teng" (AR 26) but the questionnaire was completed by Dr. Tang. (Compare AR 627 (signature illegible but office name "Patient Focused Neurology" clear), with 440 (letterhead of Dr. Henry Tang with same office name).)

21

that would "frequently" interfere with the "attention and concentration needed to perform even simple work tasks" (AR 625); could walk only one block without having to rest or experiencing severe pain (id.); could sit for only 10 minutes before needing to get up and stand for only 15 minutes without needing to sit down or walk around (id.); could sit for only two hours total in an eight-hour workday and stand for the same amount of time (AR 626); would need a job that required "shifting positions at will from sitting, standing, or walking" (id.); and would be absent from work "more than four days per month" as a result of her impairments or treatment (AR 627). But the only treatment notes from Dr. Tang in the record show that he evaluated her on March 18, 2013, for "[l]eft [u]pper [e]xtremity [p]ain and [t]ingling [s]ensation," assessed her with "chronic mild to moderate left C7 [c]ervical [r]adiculopathy" and "[m]ild left [u]lnar [n]europathy at the [e]lbow," requested an MRI, and advised her to wear an elbow sleeve on her left elbow (AR 437-39); during her April 18, 2013, follow-up appointment, he discussed the findings of "[m]ultilevel degenerative disc changes" from her MRI and recommended a referral to a specialist (AR 446). As the ALJ found (AR 26), Dr. Tang's treatment records do not reflect the extreme limitations he assessed in the cervical-spine questionnaire. Plaintiff apparently complained to Dr. Tang only about left-elbow and -upper-extremity pain; Dr. Tang's treatment notes do not mention headaches, lower-extremity pain, an inability to concentrate, or any limitations that might affect her ability to stand or sit. Indeed, he noted that she had full strength in her lower extremities on both visits. (AR 438, 445.)

22

The ALJ was entitled to discount Dr. Tang's more restrictive opinion on that basis. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected when treatment notes "provide[d] no basis for the functional restrictions he opined should be imposed on [plaintiff]"); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); De Guzman v. Astrue, 343 F. App'x 201, 209 (9th Cir. 2009) (ALJ was "free to reject" doctor's check-off report that did not explain basis for conclusions); see also Batson, 359 F.3d at 1195 ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings[.]").

The ALJ also found that Dr. Tang's opinion was contradicted by Plaintiff's medical records as a whole. (AR 26.) Indeed, Plaintiff did not identify, nor does the record reveal, any other medical-opinion evidence that assessed the extreme restrictions contained in Dr. Tang's RFC questionnaire, including his opinion that she could sit for only 10 minutes at a time or stand for only 15 minutes (AR 625), could sit or stand for "less than two hours" total in an eight-hour workday (AR 626), and would be absent from work more than four days each month (AR 627). The ALJ could permissibly cite the lack of evidence supporting Dr. Tang's opinion. See Batson, 359 F.3d at 1195.

b.  *Dr. Grewal*

The ALJ assigned "substantial weight" to the opinion of Dr. Grewal that Plaintiff would have "no more than mild impairments in mental functioning, and that her symptoms are 100% the result of her emotional response to pain," but rejected his opinion that her "depression and anxiety would interfere with her ability to perform her usual and customary occupation," finding it "internally inconsistent" with his own treatment notes and with Plaintiff's test scores.  (AR 26.)  Indeed, after administering a series of psychological tests, Dr. Grewal assessed at most moderate limitations in her workplace functioning: "slight" and "moderate" levels of work-function impairment in April 2010 (AR 395-96) and "slight" or "moderate" work-function impairments (AR 422-43) and at most "moderate" impairment in her "activities of daily living," "social functioning," "concentration, persistence, and pace," and "adaptation, decompensation in work or work-like settings" in October 2010 (AR 424-25).  Dr. Grewal opined that Plaintiff was "permanent and stationary" and needed "continued" orthopedic, chiropractic, or physical therapy and a "brief" period of biofeedback training and psychotherapeutic treatment, which would "help her maintain her level of functioning and reenter gainful employment or vocational rehabilitation."  (AR 430.)  Dr. Grewal's opinion that Plaintiff could "reenter gainful employment" with treatment calculated to "maintain" — not increase — "her level of functioning" is indeed inconsistent with an opinion that her depression and anxiety made her unable to perform "her usual and customary occupation."  (See AR 430-31.) Inconsistency with treatment notes and lack of diagnostic

24

evidence are permissible reasons for the ALJ to have given portions of Dr. Grewal's opinion little or no weight. See Connett, 340 F.3d at 875; Thomas, 278 F.3d at 957 (ALJ need not accept treating-physician opinion that is "inadequately supported by clinical findings"); cf. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

C. Remaining Issues

Plaintiff asserts that the ALJ failed to provide clear and convincing reasons to discredit her subjective symptom testimony (J. Stip. t 31-32) and did not properly assess her RFC (id. at 48-51). The ALJ may have to reevaluate Plaintiff's statements' credibility and Plaintiff's RFC in light of Dr. Padveen's opinion, so the Court does not address those arguments. See Negrette v. Astrue, No. EDCV 08-0737 RNB, 2009 WL 2208088, at *2 (C.D. Cal. July 21, 2009) (finding it unnecessary to address further disputed issues when court found that ALJ failed to properly consider treating doctor's opinion and lay-witness testimony).

D. Remand for Further Proceedings Is Appropriate

When, as here, an ALJ errs, the Court generally has discretion to remand for further proceedings. See Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended). When no useful purpose would be served by further administrative proceedings, however, or when the record has been fully developed, it is appropriate under the "credit as true" rule to direct an immediate award of benefits. See id. at 1179 (noting

25

that "the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings"); <u>Garrison v. Colvin</u>, 759 F.3d 995, 1019-20 (9th Cir. 2014).  When the ALJ's findings are so "insufficient" that a court cannot determine whether the rejected testimony should be credited as true, the Court has "some flexibility" in applying the credit-as-true rule. <u>Connett</u>, 340 F.3d at 876; <u>see also</u> <u>Garrison</u>, 759 F.3d at 1020 (noting that <u>Connett</u> established that credit-as-true rule may not be dispositive in all cases).

Here, further administrative proceedings would serve the useful purpose of allowing the ALJ to reassess Dr. Padveen's opinion, and if she again finds that it is deserving of no weight, provide a germane reason for that finding.  She may also reassess her evaluation of Dr. Axline's opinion and the credibility of Plaintiff's symptom statements and reevaluate Plaintiff's RFC in light of the evidence she previously did not consider or did not adequately explain her consideration of. Thus, remand is appropriate.  <u>See</u> <u>Garrison</u>, 759 F.3d at 1020 n.26.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's

---

[11] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

request for remand, and REMANDING this action for further
proceedings consistent with this memorandum decision.

DATED: August 17, 2017      _____
                             JEAN ROSENBLUTH
                             U.S. Magistrate Judge